1252, MOTIVA LLC v. ITC, and Nintendo as Intervenor, Mr. Bannis. Good morning, Your Honors. May it please the Court, I'm especially honored to be making my first appearance at oral argument for this tribunal. We have two issues on appeal, generally speaking, in this case. The first is the ALJ's determination of non-infringement, and the second is the ALJ's determination of no domestic industry. I thought I would start with the non-infringement determination and the standard of review. In our opinion, the standard of review essentially in dispute position information in which the Court entered a claim construction imposing a 3D limitation with which we disagree. And second, the construction of tracking movement of the user, which the ALJ entered a construction with which we did agree, our proposed construction, rejecting the limitations that Nintendo had proposed, but then, in our view, in application, reimposed those limitations in order to find no infringement. Nintendo disagrees with that assertion, at least as tracking movement of the user. As to that term, MOTIVA's proposed construction was tracking the changes of position and or orientation of a user. There were three limitations in dispute before the ALJ. The first was whether or not the system was designed to track position and orientation, sort of like a GPS, where it knows your exact location, or whether or not this was a system that was designed to track the changes in position and orientation. We use a metaphor in our brief of a speedometer, which provides information about a changing position because it's telling you how fast you're going, for example, but it doesn't tell you where you are. I thought the dispute was simply whether you were supposed to be tracking both, or one or the other. Am I missing something? Well, we view that as an additional dispute, Your Honor. So, yes, the and or, position and or orientation was our proposed construction, and the ALJ entered that construction in its plain construction order, but then faulted us for not providing a precise definition of position and orientation. The third dispute in that construction, Your Honor, was 3D space and whether or not an object had to be located by the system at its precise location in three-dimensional space. We argued that that was not the case, that instead the system was designed to track those changes in position and the movement itself, and not necessarily be required in the claims to track the exact precise location in the 3D spatial environment. Well, if all you wanted to do was track the fact of movement, why didn't you propose that as your claim construction? I mean, your claim construction contains much more to it, and this is what, that's what you asked for. I'm not sure I completely Changes in position implies that you know where the position was in the first instance, and that you know where the new position is. I mean, tracking a change contains that concept, so if all you wanted to say is that we know that something happens to be moving, why didn't, why didn't you propose that? Well, that's a good question. As far as we understood, that's what our claim construction proposal did imply, was not that you were tracking the positions and orientations themselves, but that you were tracking those changes. When we looked at the art, when we looked at the external references, that's what movement is. It's a change in position or orientation over time. So that's why we use those terms. So those terms are relevant to the definition of movement, but a position itself is a static concept, and there's no requirement in the claims or anywhere else that you must know a precise position in order to track the movement of something. And so we felt that by, we put the emphasis on the word changes, and Nintendo took the word changes out of their construction. We thought that highlighted the dispute. Can I move you before time to tell, all we have here is litigation, and why isn't this case therefore controlled by miscellaneous, by miscellaneous, a recent opinion which said essentially, among other things, that litigation alone is not adequate? Because, Your Honor, we have a couple things to consider. First, we're under the standard of in the process of establishing a domestic industry, and the court found that we were in the process of establishing domestic industry from 2003 to 2007. Yeah, but that's not relevant. We all agree that the time frame we're looking at is the time you filed, correct? Correct. But what matters, we think, is why we had to switch to litigation, and that's where Valley Midway comes in. In the view of my client, and in the view of the folks that my client talked to at the time, it was impossible for them to find a licensing partner to get these products in the marketplace with the launch of the Wii. And that forced Motivus to litigate in order to remove that threat to their business from the marketplace, because they weren't going to be able to license otherwise. So, to us, litigation was a necessary and tangible step towards the establishment of their domestic industry in this invention. All right, if we disagree with you that litigation alone cannot be enough of a necessary and tangible step, is that the end of the inquiry? If you disagree with us that the litigation from 2007 to 2010 is not enough, most likely so. But I would submit that that is the wrong result because it encourages companies to end a domestic industry, and it ignores the fact that sometimes litigation is a necessary and tangible step in order to establish... But you can see that there were no other efforts beyond the litigation to establish a domestic industry. There were no other efforts... During that time frame. That's right. They felt that their sole recourse was to seek the Wii. In some contexts, the Wii captured, in our view, the very essence of what they were trying to do. They were a very small company. They were trying to market this invention and get a product made out of it. And they were expecting and encountering a response from potential licensees, well, isn't this just the Wii? And the problem that these folks have is when a product is so famous and widely distributed and well-known and so obvious to folks, I mean, their own children said, Daddy, isn't that your invention when they saw it on TV, the advertising? When a product like that is out there saturating the marketplace, it's hard to think of another recourse other than I have to stop those guys from infringing my patent. What else could they have done? But the ALJ made specific findings that it wasn't actually saturating your marketplace, that they weren't even really competitive products. I mean, there is a big difference between $6,000 and $8,000 and $250, right? I suppose. But he did also find that in a different portion of his findings that the Wii was causing competition with these products, and we did have testimony to that regard. In fact, if you look at the record of the necessariness of the litigation, all of the testimony from the contemporaneous time supports our position. And there is no really is the ALJ speculating about what these folks could have done. Well, they could have continued to try to market the invention, he says. But he made quite a number of findings that go to this point, all of which cut against what you're trying to persuade of us here this morning. And we give deference to those findings, right? I mean, he made quite conclusive findings with respect to there was no decline in interest in the patented technology due to the release of Wii. There were numerous other things in the record that he concluded indicated that to be the case, right? He did make those conclusions, yes. So in order to, even if we accepted your legal theory that litigation is enough in this circumstance, even though miscellaneous said it wasn't, but that this is a different circumstance, that would have to be predicated on our rejecting all of the ALJ's findings in that regard, right? You would have to reject at least some of them. And I submit that you ought to, and that some of those findings should not be entitled to the level of deference you would normally assign them because bound up in those determinations are his determination that the Wii simply does not infringe the patent. I think rather than continue this discussion here, we would entertain additional briefing on the impact of a case of this court that was issued yesterday on the domestic industry issue. Okay. I'd be happy to do that. Can I ask you a question? If we agree with you, I mean, if we disagree with you on the domestic industry issue, if we conclude that in fact that the commission was correct on that, what should we do with the non-infringement finding or the claim construction? Respectfully, your decision would have a great impact on the continuing litigation that we have in the district court in Washington that's currently state. Why is that? Under Texas instruments, ITC litigation does not have any preclusive effect or even race judicata or collateral estoppel effect. Isn't that correct? It is, but your guidance would settle the issue. And I think practically speaking as a trial lawyer, your honor, what we will see is arguments from Nintendo to the district court that a judge has already looked at this and found this, you ought to as well. And those arguments, we would be making essentially an appeal within our claim construction brief to a district judge in Washington explaining why we think the ALJ got it wrong. Well, but I mean that's why I'm asking you what it is we would do. Are you saying that it would make sense for us to if we find no domestic industry or what is your proposal? I suppose that would be one possible outcome. We had hoped that the court would explain what the proper claim construction should be, but if that's not available. Okay. Okay, let's hear from the other side and we'll have your rebuttal time, Mr. Berns. Thank you. Mr. Cheney. Your honors, counsel, may it please the court. I speak today on behalf of the commission. The commission determined that Motiva failed to prove a violation of section 337 for two independent reasons. Motiva failed to prove that it was in the process of establishing a domestic industry and Motiva failed to prove that the accused Nintendo Wii products infringe the two asserted patents. And I'll begin with my discussion with the domestic industry issue. Motiva has abandoned any claim that a domestic industry actually exists in the United States. Instead, Motiva has asked this court to reweigh the evidence that was considered by the commission. Well, they didn't abandon it. I mean, the commission and they've not pursued it before this court. Right. So I suppose that they are conceding the commission's determination on that point. Instead, they're asking this court to reweigh the evidence on the commission's finding that a domestic industry was in the process of being established. Assuming that we disagree with you on or disagree with the Wii as a direct competitor in this particular market, why wouldn't it be reasonable to assume that in some instances litigation is sort of a necessary step when the big guy comes flooding your market? The best thing you can do to protect your burgeoning industry would be to try to stop that. Mesolingua makes clear, I believe, that in some cases litigation may be a step leading to the establishment of a domestic industry. And the question of the connection between that litigation and the domestic industry requirement is a question of fact. I think Mesolingua also makes that very clear. So the ALJ, affirmed by the commission in this circumstance, looked at factual issues concerning what Motiva was doing with its litigation. Now Motiva contends that its litigation was necessary to clear the market so that other licensees would license the Motiva patent. But the evidence in the record doesn't bear that out, and the ALJ made specific findings on that point. One of those findings is that the two don't compete. But even if we put that aside, as Your Honors proposed in the hypothetical, the evidence shows that the litigation was first never intended to license Nintendo. So it was not an effort toward establishing a licensing industry with respect to Nintendo. That's found in the record at A30364. Motiva admitted, quote, Motiva's litigation... Right. They don't argue this as a licensing-related litigation. So that's another fact. So they are not competitors. They didn't sue in order to license Nintendo. So what about this claim that they were clearing the field for other licensees? Well, the litigation the ALJ found was not intended to remove Nintendo from the market. Before suing Nintendo, Motiva did not send a cease and desist letter. Motiva at the district or to stop Nintendo in the market. And instead, the commission found, as a matter of fact, based on substantial evidence, that Motiva was in search of litigation winnings. And that evidence supporting the ALJ's conclusion is at A10548 and A30547. So the litigation is not intended to clear competitors from the market. The PI reference is a bit problematic considering that our case law is very sort of antithetical to preliminary injunctions. And so what you're saying is they should have essentially taken an almost a vain act and spent a lot more of their money on litigation just so that they could say that that's what they wanted to do? I don't think that's what the ALJ was doing when he looked at the preliminary injunction question. I think he was saying, I have a set of facts here and I have to determine if Motiva's steps are in fact intended to clear Nintendo from the market. And in part of that total totality of the circumstances in that factual inquiry, he looked at whether there was a cease and desist letter. He looked at whether there was an attempt to file a preliminary injunction and clear the competitor from the market. And he found that those things weren't there. And that weighed against the perhaps litigation inspired position that no, we really are trying to establish a domestic industry based on licensing. Further, the ALJ looked at Motiva's actual attempts to engage partners in licensing and found that none of those partners or potential partners either had interest in taking license or even in pursuing discussions beyond a chat in a basement on a Saturday afternoon. Those findings are found in the record A-206-33, or rather evidence supporting those findings is found in the record A-206-33, A-206-68, and A-104-56. So here we have a set of circumstances where no one was interested in licensing the technology before the Wii was released. No one was interested in licensing the technology after the Wii was released. And that doesn't appear to indicate that Motiva was engaging in litigation with an intent to clear the market, but instead was engaging in litigation in search of a large settlement or a large damages award. And that reduces to the very situation in Mesolingua that is equivalent to mere patent ownership. All Motiva was doing was what patent donors do, which is sue people for infringement. And that alone is not enough, according to this court and according to the commission's prior precedent, to show that there is a domestic industry or even a step toward a domestic industry. I'm not sure how the clock is. Do we have a divided clock today? Yes, you do. You did. You asked for eight minutes. I'm sorry. I looked down and I was unclear about my time. All right. Before you feed then to your friend, let me ask you the same question I asked before. I mean, I understand that there's a debate over whether or not domestic industry is jurisdictional and that I think that the general view is that it's not, but it is a predicate requirement, correct? Yes. The commission views it as an element of the violation of Section 337. Correct. So if we find that that element is missing, if we agree with you on that proposition, should we even address the infringement or claim construction issues? The court, I think, is free to do so. There is some more complicated precedent from this court about whether the commission's determinations on validity should be addressed because of special considerations in comparison with district court jurisdiction. I'm not implying anything we say is unclear, are you? No, I'm just saying that I don't think that that line of cases influences the fact that this court could still affirm the commission's infringement findings. And in fact, the commission would ask that the court do affirm those findings because they are based on substantial evidence. And I disagree with my colleagues. That's not necessary. I mean, if we reach the result that you speak on domestic industry, it's completely unnecessary for us to reach the claim construction infringement question, correct? The case is over. That's correct. The commission's determination should be affirmed in total, or the determination of no violation should be affirmed if there is no domestic industry in the process of being established. I do disagree with the standard of review on the claim construction issues. The commission adopted MOTIVA's claim construction of tracking movement information, and that issue is not before the court. The only question is on position information, whether the commission's construction was in accordance with the patent specification. The court would review that de novo. We believe, the commission believes that its construction is proper, supported by the patent. And in addition, even if MOTIVA's construction were selected by this court, there is no evidence in the record that the we, under their construction, establishes a reference location and the position of the user subsequently to that reference location. If there are no further questions. Do you want to yield to Mr. Davis or use his time? I'll yield to my colleague. Mr. Davis. Thank you. Thank you, Your Honor. Could you respond to Judge O'Malley's question first? Because that's where I was. Yes, that is exactly where I wanted to start, Your Honor. The answer, I think, is the one you were suggesting, which is you need not go and probably should not go past the domestic industry issue in this case. But if your response would include that, Judge O'Malley suggested to your friend, is it incumbent upon us to vacate the infringement findings? If not, if we do not do that, do they have any consequence to a subsequent proceeding? No, Your Honor. Appeals courts sit to review judgments, not opinions. And I think what happens here is the decision, the ultimate, the bottom line of the agency here is there's no violation and your affirmance would just do that. And what you say in the opinion obviously supports and unpacks that, but there's no requirement to sort of go and say which passage of the opinion is correct and which is not. And I would go beyond that and say that's actually the appropriate thing to do. I mean, I think it's the judicially modest view is to just decide what needs to be decided here. And whether you do it as a jurisdictional matter or an element of the matter, I think everyone agrees, except perhaps for the way this was briefed by some people, that the me that after Texas Instruments, the law is pretty clear that an ITC determination has no preclusive effect in district court. I think that is my understanding of the law, but I'm not sure I would let that drive what should happen here. I mean, they shouldn't be in the forum. It was so clear that right off the bat, summary determination was issued by the AOJ. Their activities were over. There was nothing going on. It was a big zero in 2007. Years pass and they come to the ITC and it ends up being a huge production for a lot of people. And there was no reason for that. And I think by getting into the merits, you're almost like continuing that process. And this should have been over early. I know we're getting a little beyond what's necessary here, but where do you fall on the jurisdictional, non-jurisdictional side of the right? It sounds to me like it's the element, it's a substantive element of the statute, but obviously we haven't briefed it. But it doesn't have that same sort of feel, but I also, I'm not a big fan of getting hung up in terminology. I mean, the practical consequences here is that my client and the ITC were put through an extensive proceeding when they shouldn't have been because the statute says in the process of being established, that's what Congress, that's what the statute says. And it was clear that nothing had been going on for years. And all that happened at the trial, we had to put on a lot of witnesses and the AFJS did a very nice, careful job. So the process has worked well, but it really, we should not have had to go through it. It should have been over early. And I think that's the point that I would like to see coming from this court, that when there was nothing going on, no licensing, no technological development, no impact from our product on the industry here, that it should have just been over. And that's why Congress put in the language. It's up to the agencies to enforce it. And when they do a fine job, I think this court should recognize that. And Your Honor, your recent interdigital opinions, I don't think really has much impact, if any, here, Your Honor, because- Well, I don't know. We would be willing to receive the comments of all involved on the applicability of that case. If it can lay this to rest, it will simplify things. May I make one tiny point about that, Your Honor, that opinion? Yes. The issue there is, is domestic industry in this country or another country, does that have salience? This is a big zero. There is nothing going on. I think you might draw any distinction in whatever you choose to write to us so that we'll appreciate since it's right on this point. Are you requiring submissions or saying only if they want to? I'm not sure I understand the order. We don't require if no one wants to respond to our invitation. I'm happy, Your Honor. We will definitely respond to your invitation. And our bottom line will be that when there is a big zero out there, it doesn't matter which country it's in. It's just not relevant. You may write that too. I will write that in more careful language, Your Honor. Yes, I will. But a mezzolingua is the right framework here, Your Honor. And there's a nice phrase in there that I like a lot about a flexible framework. I mean, this Court has not set out strict rules. It's a multi-factor test. There's no dispute that what the test is. It's a very factual application of this flexible framework, done very carefully, in detail, on an extended record. I think we had 14 witnesses, five days, a nice opinion, substantial evidence review. So even if there were some questions, you'd obviously be taking a serious level of deference. But there aren't any. They've raised nothing. Mr. Clark quoted some of the best material. The record is just replete. Lack of interest had nothing to do with the week. And the one person they spoke to after the week came around, that's at A7816. A7815, most of us failed to demonstrate that there was any decline in interest caused by a release of the week. Motivist litigation is not about likeness in Nintendo. We would not compete. I mean, it's over and over and over in this record that they were done before the week came, and they're done after the week came. There was just nothing going on. And when Congress says you can come to the ITC only if you are in the process of establishing a domestic industry, this isn't close. And that's why it was properly rejected early, and it certainly won't be rejected now. Any questions for Mr. Davis? Thank you, Mr. Davis. Mr. Gannis. Thank you. Could you just give us a status update? I mean, because there are other proceedings going on concurrently, right? So I know it's outside the record, but I was just interested in the court proceedings today. The court, the District of Washington, after transfer your honor, stayed the case pending the conclusion of re-exam and all exhaustion of appeals. So that case has currently stayed. We've been through years of re-exam now, and Motivist was successful up to the point of the Board of Patent Appeals, which then reversed the examiner, and it's back down to the examiner, and the re-exam could go on for years more. Just to be clear, I think you confidentialed out much, like 7,000 pages, regarding those re-exam proceedings. Is there a need for having done that in your briefing? Yes, I understand, and I also... It would be very helpful if you would take a very sharp pencil and just, it inhibits a free exposition of the reasoning as far as we explain it, and to the extent that you can limit that which must be shielded, it would help us. I would be very happy to do that, and we can... Within a week or so, please. If you would agree that public re-examination proceedings are not something that we would be foreclosed on doing. Absolutely, absolutely. Your honor, we've heard from my colleagues or my fellow members of the Bar about Motiva being a big zero. This is not a company that was anything like a mere patent holder. This is a company that invested thousands of hours with the two principals, hundreds of thousands of dollars in developing a prototype that they could show to try to get a product on the market. This is what we think of as an inventive company, a company that comes up with ideas and tries to get products out there. This is not a company that thinks up ideas and then looks for someone to sue. You heard... In fairness, I don't... I know he used the phrase big zero, but what he meant was in that three-year period, there was zero activity that would support... I don't think he was meaning to malign the inventors of this patent. I hope that's the case. What I was leading up to was there is no dispute that Motiva did these activities as of as look at what Motiva did from 2007 on. Motiva did not sit around on its rights and wait. If Motiva would have filed the ITC complaint in 2007, we wouldn't be having the discussion, but it went to the district court first. And so is that really the test, that if you go to a district court first to enforce your rights after your business has been substantially harmed, that you lose the ability to go to the ITC? I mean, here we have a company that did. Well, I thought you agreed with me, though, that our case law, there's some clarity in the fact that you look at what is happening at the time the ITC petition is filed. If we expand that, it's a little scary to think how confusing it might be to the public to understand and appreciate what time period is irrelevant, right? I can see that, but I think in this instance, because we are making the argument that Nintendo itself, through its infringement, harmed our business directly, I think that so long as you were taking action to enforce your rights, it shouldn't matter as much which forum you did that in. And this is another way of saying that we believe that the litigation was a necessary step. I'll finally point out that we've heard that the judge found that the litigation was not intended to license Nintendo, but also that the litigation was not intended to clear the market. And so the question becomes, what was the point of the litigation? The point of the litigation was to clear Nintendo from the market. It was not to obtain a license from Nintendo. It was to obtain an injunction and money damages in the district court. And the whole reason we went to the ITC, which doesn't have a monetary award, was to clear them from the marketplace. Unless there are questions. Any more questions for Mr. Bennett? Thank you, Mr. Bennett, and thank you both.